1   FRANK R. UBHAUS, CA STATE BAR NO. 46085
    KARA L. ERDODI, CA STATE BAR NO. 221093
2   BERLINER COHEN
    TEN ALMADEN BOULEVARD
3   ELEVENTH FLOOR
    SAN JOSE, CALIFORNIA 95113-2233
4   TELEPHONE: (408) 286-5800
    FACSIMILE: (408) 998-5388
5   frank.ubhaus@berliner.com
    kara.erdodi@berliner.com
6
    ATTORNEYS FOR PLAINTIFF
7   CHAU PAPATHEODOROU

**ADR**

**E-FILING**

FILED

2008 APR -9 P 2: 53

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11   CHAU PAPATHEODOROU, an individual,      CASE NO.

12                    Plaintiff,              COMPLAINT FOR DAMAGES

13          v.

14   ROGER CLARK, an individual; CRM          **C08  01905**
     INVESTORS CORPORATION, a Michigan
15   corporation; FORTRESS GROUP USA, LLC,
     a Michigan limited liability company;
16   NATIONAL CITY BANK, an Ohio             DEMAND FOR JURY TRIAL
     corporation, and DOES 1 through 50,
17   inclusive,

18                    Defendants.

19

20          Plaintiff Chau Papatheodorou alleges as follows:

21                                  **PARTIES**

22          1.      Plaintiff Chau Papatheodorou ("Plaintiff") is an individual residing in Palo Alto,

23   California.

24          2.      Defendant Roger Clark ("Clark") is an individual who, upon information and

25   belief, resides in Grand Rapids, Michigan.

26          3.      Defendant CRM Investors Corporation ("CRM") is a Michigan corporation

27   having its principal place of business at 1428 44th Street SW, Suite E, Grand Rapids, Michigan,

28   49509.

CASE NO.

\KERDODI\756913.1
032708-17100001

-1-

COMPLAINT FOR DAMAGES

1        4.      Defendant Fortress Group USA, LLC ("Fortress") is a Michigan limited liability

2    company having its principal place of business at 1428 44th Street SW, Suite E, Grand Rapids,

3    Michigan, 49509.

4        5.      Defendant National City Bank ("NCB") is an Ohio corporation having its

5    principal place of business at 200 Public Square, 5th Floor, Cleveland, Ohio, 44114.

6                        **JURISDICTION AND VENUE**

7        6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and

8    1332.

9        7.      Venue is proper in this district pursuant to 28 U.S.C. §1391, as this is a judicial

10    district in which a substantial part of the events giving rise to the claim occurred.

11                        **COMMON ALLEGATIONS**

12        8.      CRM is a finance consulting organization involved in arranging the sale and/or

13    purchase of bank paper, high-yield private placement transactions, project funding, and private

14    foreign currency exchange.

15        9.      Fortress is a company established in March 2006 to conduct a private placement

16    transaction program involving trading in United States Treasury Bills ("T-Bills").

17        10.    At all times relevant hereto, Clark was an agent of CRM and Fortress.

18        11.    NCB is a financial holding company engaging in commercial and retail banking,

19    mortgage financing and servicing, consumer finance and asset management.

20        12.    NCB has an indirect, wholly-owned subsidiary called Allegiant Asset

21    Management Company ("Allegient"), which offers escrow services and manages and administers

22    assets as a fiduciary for businesses, institutions and individuals.

23        13.    In July 2007, Papatheodorou was introduced to Clark, who held himself out to be

24    the Program Manager for an investment opportunity called "Fidelity Treasury Bills Trading."

25        14.    In July 2007, Clark explained this program to Chau as follows:  Clark works with

26    a trader in New York who was allegedly experienced and well-credentialed (Clark would not

27    divulge the name of the trader, fearing he would be "cut out" of the deal).  The trader works for

28    himself and not for any financial institution.  The investor must invest a minimum of one million

CASE No.                   -2-

1    dollars ($1,000,000.00). If the investor wished to invest in excess of one million dollars, he or

2    she could do so, but only in increments of one hundred thousand dollars ($100,000.00). The

3    investor had to commit to at least a five-month term, or could opt to participate in a longer-term

4    contract, but only in five-month increments (i.e., ten months, fifteen months, etc.). The

5    investor's principal investment would be deposited into an escrow account which would be

6    managed and administered by an escrow agent at Allegiant, a subsidiary of NCB. An initial

7    escrow fee would apply. At the beginning of each thirty (30) days, the escrow agent would

8    replace the one million dollars in the escrow account with T-Bills worth the sum of the original

9    investment plus thirty percent profit. At the end of each thirty (30) days, the T-Bills would be

10   replaced with the cash equivalent of the sum of the original investment plus thirty percent profit.

11   Once the escrow account was funded with the sum of the original investment plus profit in U.S.

12   dollars, the escrow agent was to wire twenty percent (20%) of the specific amount of each

13   investor's profit to the individual investor's banking coordinates. Clark also receives ten percent

14   (10%) of each investor's profits. If at any time after 30 days the investor was not satisfied or for

15   any reason did not receive profits according to the program's terms, he or she could terminate the

16   agreement and the original investment principal would be wired back into his or her own bank

17   account with no questions asked.

18       15.    Papatheodorou had questions about the T-Bills program and sent Clark e-mail

19   correspondence in August 2007 seeking clarification and explanation. On August 3, 2007, Clark

20   represented to Papatheodorou in an e-mail communication that (1) the program was quite safe

21   because they use NCB as an escrow agent, and because the investor's money stays in escrow

22   until the trader delivers T-Bills equivalent to 100% of the investment amount at market value; (2)

23   the trader was independent but used both Fidelity and Merrill Lynch as his "trading house"; (3)

24   the trader had been trading T-Bills very successfully for 18 years averaging seventy percent

25   (70%) profit monthly; (4) that CRM had been a customer of NCB for several years, having both

26   an institutional trust account and an escrow account that NCB operated for them, and having

27   completed several deals in escrow with NCB.

28

\KERDODI\756913.1
032708-17100001

1    16.    On or about August 23, 2007, Clark represented to Papatheodorou in an e-mail

2    communication that: (1) he talks with the escrow agent at NCB several times each week; (2) he

3    is "well informed about all that is happening," and (3) all information to and from the escrow

4    agent comes through him.

5    17.    Clark represented to Papatheodorou that Fortress had other clients who had

6    recently participated in the T-Bills program, who had received profits.

7    18.    On or about August 16, 2007, Papatheodorou and Clark entered into an agreement

8    entitled "Participation Agreement (United States Treasury Bill Program)," (hereinafter,

9    "Participation Agreement"). A true and correct copy of the Participation Agreement is attached

10   hereto and incorporated herein by reference as Exhibit A. Under the Participation Agreement,

11   Papatheodorou invested one million dollars ($1,000,000.00), plus an escrow fee of one thousand

12   five hundred dollars ($1,500.00) in the T-Bill program for a term of fifteen (15) months.

13   19.    On or about August 16, 2007, Clark, acting on behalf of Fortress, entered into an

14   Escrow Agreement with National City Bank for the benefit of Papatheodorou ("Escrow

15   Agreement"). The Participation Agreement between Clark and Papatheodorou was incorporated

16   into the Escrow Agreement as its Exhibit A. A true and correct copy of the Escrow Agreement

17   is attached hereto and incorporated herein by reference as Exhibit B.

18   20.    Under the Escrow Agreement, NCB agreed to hold Papatheodorou's initial

19   investment principal of one million dollars ($1,000,000.00), less the escrow fee of $1,500.00, in

20   an escrow account "for the sole benefit of" Papatheodorou, known as "Fortress #202

21   Participation."

22   21.    The Escrow Agreement contains as its Exhibit B a document entitled "Irrevocable

23   Instructions to Release Escrow Fund" (hereinafter, "Escrow Instructions"). The Escrow

24   Instructions to NCB set forth the schedule of deposits and release of funds from the Fortress

25   #202 Participation escrow account set up for Papatheodorou's benefit.

26   22.    On or about August 15, 2007, Papatheodorou caused $1,001,500.00 to be wired to

27   NCB and Allegiant for the Fortress Client #202 Participation escrow account.

28

1    23.    Papatheodorou received $180,000.00 profit from her investment in September

2    2007 and $180,000.00 in October 2007. These funds were received by wire transfer into her

3    personal bank account.

4    24.    During the months of September and October 2007, Papatheodorou asked Clark

5    several times for copies of the monthly trading statements. In response, Clark represented to

6    Papatheodorou that the statements were not broken down at the individual client level, but only

7    shows the aggregated funds from all of the participating clients under Fortress' umbrella. Clark

8    told Papatheodorou that confidentiality concerns prevented him from releasing this information

9    to any of Fortress' clients.

10    25.    On October 23, 2007, Papatheodorou asked Clark for a copy of a bank statement

11    or escrow fund statement to confirm the balance of her escrow account, and asked to receive

12    such a statement on a regular basis.

13    26.    In an e-mail correspondence dated October 24, 2007, Clark represented to

14    Papatheodorou that he could not provide her with a copy of a bank statement because the

15    statement would contain other clients' confidential information. He confirmed, however, that "in

16    the account there are a quantity of 186,000 thirty year US Treasury Notes with a value of just

17    over $61 million. This is more than enough to cover all of the client positions including yours."

18    27.    No profits were deposited into Papatheodorou's account in November 2007.

19    28.    On or about November 28, 2007, Papatheodorou spoke on the telephone with

20    Clark, who represented to her that the trader had suffered a minor heart attack a few weeks

21    before Thanksgiving, and had been unable to do any trading in the month of November.

22    29.    On or about November 28, 2007, Clark sent Papatheodorou an e-mail message

23    containing a "sanitized" message from the trader (incorporated into the body of Clark's message,

24    but with any information about the sender, time and date of transmission, etc., deleted). In the e-

25    mail message, the "trader" admitted that there would be no profits for the month of November

26    2007, but committed to pay November and December profits to Papatheodorou on the regular

27    December 2007 payment date, plus ten percent (10%) additional on the November profit.

28

\KERDODI\756913.1
032708-17100001

1    30.    In November and December 2007, Papatheodorou contacted Clark several times

2    to check in on the trader's health, and whether her funds were still in the Fortress #202

3    Participation escrow account.  Clark represented that "things are going as planned," and that

4    "there should be plenty of T-Bills, around five million to six million dollars' worth, to cover

5    you."

6    31.    On December 6, 2007, Papatheodorou made a trip to Clark's office in Grand

7    Rapids, Michigan.  During this trip, Papatheodorou and her husband met with Clark, and had

8    dinner with Clark and his wife, Crystal.

9    32.    During this trip the first week of December 2007, Clark made several oral

10    representations to Papatheodorou, including: (1) the distribution system is set up in such a way

11    that before the trader makes a buying decision, he must have another "commitment holder" in

12    place for selling the instruments; (2) all of the trading is done on a "pre-contract," "pre-

13    allocated," and "pre-funded" basis; (3) the trader trades at very high volume and low margin; (4)

14    trading is done Monday through Thursday, with three to four trades occurring per day, and

15    Friday is the settlement date; (5) when the investor's money is deposited into the escrow account,

16    the trader take out a line of credit based on the total cash value on the accounts for trading

17    purchases; (6) in the T-Bills program Papatheodorou was involved in, the trader must deposit T-

18    Bills into the account to replace the cash at the beginning of each month, and replace the T-Bills

19    with cash at the end of each month, so the client's principal investment "does not move," but

20    "stays in the account the entire time," and the profit is deposited into the client's account at the

21    end of each month.

22    33.    No profits were deposited into Papatheodorou's account in December 2007.

23    34.    Papatheodorou contacted Clark just before the Christmas holiday, 2007.  Clark

24    represented to Papatheodorou he had not heard from the trader, and advised her to wait until after

25    the holidays to check in again.

26    35.    During the first week of January 2008, Papatheodorou continued to contact Clark,

27    who again represented to Papatheodorou that he had not heard from the trader and did not know

28    of the trader's whereabouts.  Clark suggested that Papatheodorou wait until the second week of

CASE NO.

-6-

COMPLAINT FOR DAMAGES

1    January 2008, at which time, if they had not heard from the trader, they would plan a course of

2    action.

3       36.    On January 10, 2008, Clark told Papatheodorou she should send a "Request to

4    Liquidate" the Fortress #202 Participation escrow account, since there were T-Bills valued at $5

5    million still in the account, and she would receive a disbursement in three to four days.

6       37.    At the same time, Clark told Papatheodorou that once the liquidation of the

7    escrow account was complete, Papatheodorou had the option to transfer her one million dollar

8    principal investment to another trading program with the Union Bank of Switzerland, where they

9    would pay at a slightly better rate.

10       38.    On or about January 18, 2008, Papatheodorou sent Clark and the NCB escrow

11    agent notice by facsimile, e-mail and certified mail, a Request to Liquidate the Fortress #202

12    Participation escrow account, instructing Clark and the escrow agent, Dawn Dewerth, to wire her

13    one million dollars to her personal bank account. A true and correct copy of this letter is

14    attached hereto as Exhibit C.

15       39.    On or about January 24, 2008, Clark blamed the lack of profits on a bank error,

16    and asked Papatheodorou: (1) for more time to "make you completely whole in a couple of

17    weeks," (2) not to contact the escrow agent at NCB, and (3) to "keep this between the two of

18    us."

19       40.    On or about January 25, 2008, Papatheodorou sent Clark and NCB escrow agent

20    Dawn Dewerth correspondence, again demanding that her escrow account be liquidated and the

21    funds wired to her personal account immediately.

22       41.    On February 6, 2008, Papatheodorou and Clark had a conversation in which Clark

23    represented that he was seeking a loan against his company to repay her principal no later than

24    February 15, 2008.

25       42.    Clark never contacted Papatheodorou again, and failed to return any of her one

26    million dollar principal investment.

27       43.    NCB has refused and continues to refuse to return the funds from

28    Papatheodorou's escrow account to her.

CASE NO.                 -7-

## FIRST CAUSE OF ACTION: BREACH OF WRITTEN CONTRACT

### (Against All Defendants)

44.    Papatheodorou incorporates by reference paragraphs 1 through 43 inclusive, as if fully set forth here.

45.    Papatheodorou was the third-party beneficiary of a written contract existing between Clark and NCB (the Escrow Agreement).

46.    A written contract existed between Papatheodorou and Clark (the Participation Agreement).

47.    Papatheodorou wired the sum of $1,001,500.00 to NCB to fund her participation in the T-Bill program and fully performed all duties attributable to her under the contracts.

48.    Papatheodorou is informed and believes, and on that basis alleges, that NCB breached the written contract by failing to question Clark or investigate the suspicious Escrow Instructions he presented to NCB as an exhibit to the Escrow Agreement, by permitting monies to be removed from the Fortress #202 Participation escrow account in contravention of the Escrow Instructions, and by refusing and continuing to refuse to return to Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

49.    Papatheodorou is informed and believes and on that basis alleges that Clark breached the written Participation Agreement by misrepresenting the T-Bills program as a safe and legitimate investment program, by failing to deliver profits in November and December 2007 pursuant to the Participation Agreement, by conducting a fraudulent scheme to deprive Papatheodorou of her $1 million principal investment, by directing the disbursement of Papatheodorou's $1 million principal investment to other accounts in his names or in the names of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations or the debts and obligations of CRM and Fortress,  and by failing to cause to be returned to Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

50.    As a direct and proximate result of Defendants' breach of the written contracts, Papatheodorou has suffered damages in an amount to be proven at trial.

\KERDODI\756913.1
032708-17100001

1    WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as

2    set forth below.

### SECOND CAUSE OF ACTION: SPECIFIC PERFORMANCE

### (Against All Defendants)

5    51.    Papatheodorou incorporates by reference paragraphs 1 through 50 inclusive, as if

6    fully set forth here.

7    52.    Papatheodorou was the third-party beneficiary of a written contract existing

8    between Clark and NCB (the Escrow Agreement).

9    53.    A written contract existed between Papatheodorou and Clark (the Participation

10    Agreement).

11    54.    Papatheodorou wired the sum of $1,001,500.00 to NCB to fund her participation

12    in the T-Bill program and fully performed all duties attributable to her under the contracts.

13    55.    Papatheodorou is informed and believes, and on that basis alleges, that NCB

14    breached the written contract by failing to question Clark or investigate the suspicious Escrow

15    Instructions he presented to NCB as an exhibit to the Escrow Agreement, by permitting monies

16    to be removed from the Fortress #202 Participation escrow account in contravention of the

17    Escrow Instructions, and by refusing and continuing to refuse to return to Papatheodorou the

18    funds in the Fortress #202 Participation escrow account upon her demands.

19    56.    Papatheodorou is informed and believes and on that basis alleges that Clark

20    breached the written Participation Agreement by misrepresenting the T-Bills program as a safe

21    and legitimate investment program, by failing to deliver profits in November and December

22    2007 pursuant to the Participation Agreement, by conducting a fraudulent scheme to deprive

23    Papatheodorou of her $1 million principal investment, by directing the disbursement of

24    Papatheodorou's $1 million principal investment to other accounts in his names or in the names

25    of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations

26    or the debts and obligations of CRM and Fortress,  and by failing to cause to be returned to

27    Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

28

\KERDODI\756913.1
032708-17100001

COMPLAINT FOR DAMAGES

57.    Under the terms of the Escrow Agreement, Papatheodorou is entitled to specific performance, and specifically, the release of all monies in the Fortress #202 Participation escrow account.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

### THIRD CAUSE OF ACTION: NEGLIGENCE

### (Against All Defendants)

58.    Papatheodorou incorporates by reference paragraphs 1 through 57 inclusive, as if fully set forth here.

59.    NCB, a financial institution and escrow agent, owed a duty of due care to its depositor, Papatheodorou.

60.    Clark owed a duty of due care to Papatheodorou to be honest and forthcoming about the investment program he induced her to enter into.

61.    Papatheodorou is informed and believes, and on that basis alleges, that NCB breached its duty of care by negligently failing to question Clark or investigate the suspicious Escrow Instructions he presented to NCB as an exhibit to the Escrow Agreement.

62.    Papatheodorou is informed and believes and on that basis alleges that Clark breached his duty of care by misrepresenting the T-Bills program as a safe and legitimate investment program, by failing to deliver profits in November and December 2007 pursuant to the Participation Agreement, by conducting a fraudulent scheme to deprive Papatheodorou of her $1 million principal investment, by directing the disbursement of Papatheodorou's $1 million principal investment to other accounts in his names or in the names of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations or the debts and obligations of CRM and Fortress, and by failing to cause to be returned to Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

63.    As a direct and proximate result of Defendants' negligence, Papatheodorou has been damaged in an amount to be proven at trial.

\KERDODI\756913.1
032708-17100001

64.    As a direct and proximate result of Defendant's negligent act and omissions, Papatheodorou has suffered emotional distress.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

## FOURTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

65.    Papatheodorou incorporates by reference paragraphs 1 through 64 inclusive, as if fully set forth here.

66.    NCB, a financial institution and escrow agent, was in a fiduciary position vis-à-vis Papatheodorou as a depositor, and owed her a fiduciary duty of care.

67.    Clark, as the director of the investment program, was in a fiduciary position vis-à-vis Papatheodorou as an investor, and owed her a fiduciary duty of care.

68.    Papatheodorou is informed and believes, and on that basis alleges, that NCB breached its fiduciary duty by negligently failing to question Clark or investigate the suspicious Escrow Instructions he presented to NCB as an exhibit to the Escrow Agreement.

69.    Papatheodorou is informed and believes and on that basis alleges that Clark breached his fiduciary duty to her by misrepresenting the T-Bills program as a safe and legitimate investment program, by failing to deliver profits in November and December 2007 pursuant to the Participation Agreement, by conducting a fraudulent scheme to deprive Papatheodorou of her $1 million principal investment, by directing the disbursement of Papatheodorou's $1 million principal investment to other accounts in his names or in the names of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations or the debts and obligations of CRM and Fortress. and by failing to cause to be returned to Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

70.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Papatheodorou has been damaged in an amount to be proven at trial.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

**FIFTH CAUSE OF ACTION:**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against All Defendants)**

71.    Papatheodorou incorporates by reference paragraphs 1 through 70 inclusive, as if fully set forth here.

72.    Papatheodorou was the third-party beneficiary of a written contract existing between Clark and NCB (the Escrow Agreement), and implied in that contract is a covenant of good faith and fair dealing.

73.    A written contract existed between Papatheodorou and Clark (the Participation Agreement), and implied in that contract is a covenant of good faith and fair dealing.

74.    Papatheodorou fully performed all duties attributable to her under the contracts.

75.    Papatheodorou is informed and believes, and on that basis alleges, that NCB breached the implied covenant of good faith and fair dealing by failing to question Clark or investigate the suspicious Escrow Instructions he presented to NCB as an exhibit to the Escrow Agreement, by permitting monies to be removed from the Fortress #202 Participation escrow account in contravention of the Escrow Instructions, and by refusing and continuing to refuse to return to Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

76.    Papatheodorou is informed and believes and on that basis alleges that Clark breached the implied covenant of good faith and fair dealing by misrepresenting the T-Bills program as a safe and legitimate investment program, by failing to deliver profits in November and December 2007 pursuant to the Participation Agreement, by conducting a fraudulent scheme to deprive Papatheodorou of her $1 million principal investment, by directing the disbursement of Papatheodorou's $1 million principal investment to other accounts in his names or in the names of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations or the debts and obligations of CRM and Fortress, and by failing to cause to be returned to Papatheodorou the funds in the Fortress #202 Participation escrow account upon her demands.

77.    As a direct and proximate result of Defendants' breach of the written contracts, Papatheodorou has suffered damages in an amount to be proven at trial.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

### SIXTH CAUSE OF ACTION: CONVERSION

### (Against All Defendants)

78.    Papatheodorou incorporates by reference paragraphs 1 through 77 inclusive, as if fully set forth here.

79.    Papatheodorou wired the sum of $1,001,500.00 to NCB to be placed into the Fortress #202 Participation escrow account for her benefit.  NCB has refused, and continues to refuse, to return the funds in that account to Papatheodorou, despite her demands.

80.    During the relevant time period, Plaintiff is informed and believes and on that basis alleges that Clark directed the disbursement of Papatheodorou's $1 million principal investment to other accounts in his names or in the names of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations or the debts and obligations of CRM and Fortress.  Papatheodorou is informed and believes and on that basis alleges that Clark's conducted resulted in misappropriating and converting to his personal use a sum to be proven at trial.

81.    As a direct and proximate result of Defendants' conversion, Papatheodorou has suffered damage in an amount to be proven at trial, but which is believed to be approximately $600,000.00.

82.    Between the time of Defendants' conversion of the above-mentioned property to their own use and the filing of this action, Papatheodorou has had to hire attorneys, has used staff time properly expended in the pursuit of the converted property, all to Papatheodorou's further damage in a sum yet to be ascertained, but in excess of $25,000.00.

83.    Defendant's acts alleged above were willful, wanton, malicious and oppressive, and were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

CASE NO.                                    -13-

1    WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as

2  set forth below.

3  **SEVENTH CAUSE OF ACTION: FRAUD – INTENTIONAL MISREPRESENTATION**

4  **(Against Defendants Clark, CRM and Fortress)**

5    84.    Papatheodorou incorporates by reference paragraphs 1 through 83 inclusive, as if

6  fully set forth here.

7    85.    At all times relevant hereto, Papatheodorou is informed and believes and on that

8  basis alleges that Clark was the agent and acting on behalf of CRM and Fortress.

9    86.    The representations made by Clark as more particularly specified in Paragraphs

10  14-17, 24, 26, 28-30, 32, 34-36, and 41 were in fact false.

11    87.    Papatheodorou is informed and believes, and on that basis alleges, that at the time

12  Clark made the above-referenced representations, he knew them to be false.

13    88.    Papatheodorou is informed and believes, and on that basis alleges, that Clark

14  made the above-referenced representations with the intent to defraud and deceive Papatheodorou,

15  and to induce Papatheodorou into investing in the T-Bills program, to prevent Papatheodorou

16  from liquidating her escrow account, and to prevent Papatheodorou from discovering the

17  illegitimate nature of the T-Bills program.

18    89.    At the time Clark made the above-referenced representations, Papatheodorou was

19  ignorant of the falsity of Clark's representations and believed them to be true.

20    90.    Papatheodorou had asked Clark many questions and undertook to learn about him,

21  CRM, Fortress and NCB prior to investing in the T-Bills program, and no reason to believe his

22  representations were false. Papatheodorou's reliance on Clark's representations was justified.

23    91.    As a proximate result of Clark's intentional misrepresentations, Papatheodorou

24  has been damaged in a sum yet to be determined, but approximately $600,000.00.

25    92.    Clark's false misrepresentations were made intentionally, wantonly and willfully

26  with the design to defraud Plaintiff, to deprive Plaintiff of her $1 million principal investment.

27  Clark's conduct was outrageous and in reckless disregard for Plaintiff's rights. As such Plaintiff

28  is entitled to an aware of punitive and exemplary damages.

\KERDODI\756913.1
032708-17100001

1    WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as

2  set forth below.

3    **EIGHTH CAUSE OF ACTION: FRAUD – NEGLIGENT MISREPRESENTATION**

4    **(Against Defendants Clark, CRM and Fortress)**

5    93.    Papatheodorou incorporates by reference paragraphs 1 through 92 inclusive, as if

6  fully set forth here.

7    94.    At all times relevant hereto, Papatheodorou is informed and believes and on that

8  basis alleges that Clark was the agent and acting on behalf of CRM and Fortress.

9    95.    The representations made by Clark as more particularly specified in Paragraphs

10  14-17, 24, 26, 28-30, 32, 34-36, and 41 were in fact false.

11    96.    Papatheodorou is informed and believes, and on that basis alleges, that at the time

12  Clark made the above-referenced representations, he had no reasonable basis to believe they

13  were true.

14    97.    At the time Clark made the above-referenced representations, Papatheodorou was

15  ignorant of the falsity of Clark's representations and believed them to be true.

16    98.    Papatheodorou had asked Clark many questions and undertook to learn about him,

17  CRM, Fortress and NCB prior to investing in the T-Bills program, and no reason to believe his

18  representations were false.  Papatheodorou's reliance on Clark's representations was justified.

19    99.    As a proximate result of Clark's negligent misrepresentations, Papatheodorou has

20  been damaged in a sum yet to be determined, but approximately $600,000.00.

21    100.    Clark's false misrepresentations were made with the design to induce Plaintiff to

22  invest in the fraudulent T-Bills scheme and deprive Plaintiff of her $1 million principal

23  investment.  Clark's conduct was outrageous and in reckless disregard for Plaintiff's rights.  As

24  such Plaintiff is entitled to an aware of punitive and exemplary damages.

25    WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as

26  set forth below.

27  ///

28  ///

\KERDODI\756913.1
032708-17100001

## NINTH CAUSE OF ACTION: FRAUD – FRAUDULENT CONCEALMENT

### (Against Defendants Clark, CRM and Fortress)

101.    Papatheodorou incorporates by reference paragraphs 1 through 100 inclusive, as if fully set forth here.

102.    At all times relevant hereto, Papatheodorou is informed and believes and on that basis alleges that Clark was the agent and acting on behalf of CRM and Fortress.

103.    Clark made the false representations as more particularly specified in Paragraphs 14-17, 24, 26, 28-30, 32, 34-36, and 41 to conceal from Papatheodorou the true material facts – that the T-Bills program was a fraudulent scheme, that she would not receive monthly profits for the entire period of the contract, that her $1 million principal investment would not be returned, and that Clark had directed the disbursement of Papatheodorou's $1 million principal investment to other accounts in his names or in the names of third parties, for the benefit of Clark and his family, or to satisfy Clark's debts and obligations or the debts and obligations of CRM and Fortress.

104.    Papatheodorou is informed and believes, and on that basis alleges, that at the time Clark made the above-referenced representations, he knew them to be false.

105.    Papatheodorou is informed and believes, and on that basis alleges, that Clark made the above-referenced representations with the intent to defraud and deceive Papatheodorou, and to induce Papatheodorou into investing in the T-Bills program, to prevent Papatheodorou from liquidating her escrow account, and to prevent Papatheodorou from discovering the illegitimate nature of the T-Bills program.

106.    At the time Clark made the above-referenced representations, Papatheodorou was ignorant of the falsity of Clark's representations and believed them to be true.

107.    Papatheodorou had asked Clark many questions and undertook to learn about him, CRM, Fortress and NCB prior to investing in the T-Bills program, and no reason to believe his representations were false. Papatheodorou's reliance on Clark's representations was justified.

108.    As a proximate result of Clark's fraudulent concealment, Papatheodorou has been damaged in a sum yet to be determined, but approximately $600,000.00.

\KERDODI\756913.1
032708-17100001

109.   Clark's fraudulent concealment was done intentionally, wantonly and willfully with the design to defraud Plaintiff, to deprive Plaintiff of her $1 million principal investment. Clark's conduct was outrageous and in reckless disregard for Plaintiff's rights. As such Plaintiff is entitled to an aware of punitive and exemplary damages.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

## TENTH CAUSE OF ACTION: FRAUD – PROMISE WITHOUT INTENT TO PERFORM

### (Against Defendants Clark, CRM and Fortress)

110.   Papatheodorou incorporates by reference paragraphs 1 through 109 inclusive, as if fully set forth here.

111.   At all times relevant hereto, Papatheodorou is informed and believes and on that basis alleges that Clark was the agent and acting on behalf of CRM and Fortress.

112.   Clark made promises to Papatheodorou as more particularly specified in Paragraphs 14-17, 24, 26, 28-30, 32, 34-36, and 41.

113.   Papatheodorou is informed and believes, and on that basis alleges, that at the time Clark made the above-referenced promises, he had no intention of performing them.

114.   Papatheodorou is informed and believes, and on that basis alleges, that Clark made the above-referenced promises with the intent to defraud and deceive Papatheodorou, and to induce Papatheodorou into investing in the T-Bills program, to prevent Papatheodorou from liquidating her escrow account, and to prevent Papatheodorou from discovering the illegitimate nature of the T-Bills program.

115.   At the time Clark made the above-referenced promises, Papatheodorou was ignorant of the falsity of Clark's promises and believed them to be true.

116.   Papatheodorou had asked Clark many questions and undertook to learn about him, CRM, Fortress and NCB prior to investing in the T-Bills program, and no reason to believe Clark's promises were false. Papatheodorou's reliance on Clark's promises was justified.

117.   As a proximate result of Clark's false promises and failure to perform on those promises, Papatheodorou has been damaged in a sum yet to be determined, but approximately $600,000.00.

118.   Clark made the above-referenced false promises intentionally, wantonly and willfully with the design to defraud Plaintiff, to deprive Plaintiff of her $1 million principal investment. Clark's conduct was outrageous and in reckless disregard for Plaintiff's rights. As such Plaintiff is entitled to an aware of punitive and exemplary damages.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

### ELEVENTH CAUSE OF ACTION:

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendants Clark, CRM and Fortress)

119.   Papatheodorou incorporates by reference paragraphs 1 through 118 inclusive, as if fully set forth here.

120.   At all times relevant hereto, Papatheodorou is informed and believes and on that basis alleges that Clark was the agent and acting on behalf of CRM and Fortress.

121.   Clark's conduct was extreme and outrageous and made with the intention of causing, or reckless disregard of the probability of causing, Papatheodorou's emotional distress.

122.   As a direct and proximate result of Clark's extreme and outrageous conduct, Papatheodorou has suffered emotional distress damages in an amount to be determined at trial.

123.   Clark's extreme and outrageous conduct was done intentionally, wantonly and willfully with the design to defraud Plaintiff, to deprive Plaintiff of her $1 million principal investment. Clark's conduct was outrageous and in reckless disregard for Plaintiff's rights. As such Plaintiff is entitled to an aware of punitive and exemplary damages.

WHEREFORE, Papatheodorou prays judgment against Defendants and each of them as set forth below.

///

///

\KERDODI\756913.1
032708-17100001

**PRAYER FOR RELIEF**

As to All Causes of Action

     1.     For compensatory damages in a sum according to proof but believed to be approximately $600,000.00; and

     2.     For special damages in a sum according to proof;

     3.     For costs of suit herein incurred;

     4.     For such other and further relief as the Court may deem proper;

As to the Second Cause of Action

     1.     For an order that Defendant NCB specifically perform the Escrow Agreement, and specifically the release of Papatheodorou's funds in the Fortress #202 Participation escrow agreement, as to the second cause of action only;

     2.     For an order that Defendants Clark, CRM and Fortress specifically perform the Participation Agreement, as to the second cause of action only; and

As to the Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Causes of Action

     1.     For punitive damages.

DATED: MARCH 21, 2008

BERLINER COHEN

BY: _____
FRANK R. UBHAUS
ATTORNEYS FOR PLAINTIFF CHAU
PAPATHEODOROU

\KERDOD\756913.1
032708-17100001

# EXHIBIT "A"

## Participation Agreement
## (United States Treasury Bill Program)

This PARTICIPATION AGREEMENT (the "Participation Agreement") referred hereinafter as Exhibit "A", shall be effective from the date hereof and is entered into this 16th day of August, 2007, by and between:

FORTRESS GROUP USA, LLC, (hereinafter "Fortress"), 1428 44th St. SW, Suite E, Grand Rapids, MI 49509, 616-530-9864, fax 616-530-9870, duly represented by Mr. Roger L. Clark, and Chau Papatheodorou (hereinafter "Client"), 2317 St. Francis Drive, Palo Alto, CA 94303, (650) 804-1222, fax (650) 494-1438.

1.  Client wishes to acquire participation in a Private Placement Transaction (the "Transaction") in the amount of One Million United States Dollars (US$1,000,000.00)("Transaction Amount") hereinafter referred to as the ("Fortress #202 Participation"), and Fortress agrees to arrange for the establishment of the Transaction.

2.  Client has further advised Fortress that Client has a complete understanding of the matter pertaining to the above Private Placement Transaction and has relied solely upon his/her/its own legal, business, investment and financial advisors with respect to same.

3.  Client agrees to wire transfer funds in the amount of One Million United States Dollars (US$1,000,000.00) plus One Thousand Five Hundred United States Dollars (US$1,500.00), to pay the escrow fee, to National City Bank (the "Escrow Agent") under certain terms of the Escrow Agreement dated August 16, 2007, ABA # 041000124, Account # 2171150005490 with further credit to Escrow Account # 01000103251. These funds less the Escrow Fee ("Escrow Fund") shall be held by the Escrow Agent for the sole benefit of Client, until the Trade Entity shall deliver United States Government Treasury Bills ("T-Bills") into the Escrow Account equal in market value to a minimum of One Hundred percent (100%) of the Escrow Fund held in the Escrow Account. These T-Bills shall remain in the Escrow Account for a term of Fifteen (15) months. At thirty (30) days intervals after delivery of the T-Bill into the Client Escrow Account, a minimum profit of Thirty Percent (30%) shall be deposited to the Client Escrow Account and disbursed by the Escrow Agent per the disbursement schedule contained in the Escrow Release Instructions, Exhibit "B" herein and shall form an integral part of the Agreement. At the end of the term of Fifteen (15) months, the T-Bills will be redeemed by the Trade Entity with cash equal to the original amount of the Escrow Fund and immediately returned to the Client.

4.  Client guarantees that there will not be any liability incurred from any brokerage, finders, investors, consultants or similar fees in connection with the Fortress #202 Participation.

Fortress Initials _____          Client Initials _____

5.   Fortress agrees that, if the T-Bills and the first profits of Thirty Percent (30%) are not delivered into the Client Escrow Account within Thirty (30) international banking days after escrow funds are received, the escrow fund will be immediately returned to Client by wire transfer without protest, offset or deduction whatsoever except for normal wire fee.

6.   Client has made full and complete disclosure to third parties, if any, who have or may have supplied funds which have been or will be deposited into escrow, that said funds are intended to be employed for a certain Private Placement Transaction. Client has received from his/her/its own advisors and fully disclosed to all third parties the risks involved in this Participation Agreement and with respect to the Fortress #202 Participation. In the event of any litigation relating to this Participation Agreement, the losing party or parties agree to pay all of the costs and expenses and reasonable attorney's fees incurred both at trial and on appeal of the prevailing party or parties. Client hereby agrees to indemnify and defend Fortress, the Escrow Agent and Fidelity Investments under any and all circumstances from any and all claims arising as a result of any brokerage, finder or consultant fees with respect to this Participation Agreement or any and all claims arising as a result of any agreements between Fortress and Client and/or Fidelity Investments.

7.   This Participation Agreement may be amended or revised only in writing and signed by both parties hereto. The State of Michigan shall be the legal venue with respect to this Participation Agreement and any action in relation thereto. Electronically transmitted signatures shall have the same standing as an original. Each party hereto warrants that they have full and complete authority to enter into this Agreement and bind their respective person or company. This Participation Agreement may be simultaneously executed in two (2) counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, provided that all such counterparts, in the aggregate, shall contain the legal signatures of all parties to this Participation Agreement. Each of the terms and provisions of this Participation Agreement is to be deemed serviceable in whole or in part and, if any term or provision or the application thereof in any circumstance should be invalid, illegal or unenforceable, the remaining terms and provisions or the application thereof to circumstances other than those as to which it is held invalid, illegal or unenforceable shall not be affected thereby and shall remain in full force and effect.

8.   This Participation Agreement represents the full and complete agreement of the parties with respect to the subject matter of this Participation Agreement and supersedes and replaces any prior understanding and agreement.

THIS SPACE INTENTIONALLY LEFT BLANK

Fortress Initials _____        Client Initials ___CP._____

IN WITNESS AND FULL AGREEMENT WHEREOF, this document has been executed as of the date first written above, and shall be effective from the date hereof. Each party, by entering their signature below hereby attest fully and without reservation that they have had adequate time to consult with legal, financial, investment and business counsel, have received full and adequate risk disclosure, and agree fully to the terms and conditions of this disclosure and agree fully to the terms and conditions of this Participation Agreement.

Client

By: _____

Chau Papatheodorou

FORTRESS GROUP USA, LLC

By: _____

Roger L. Clark, Managing Member

# ESCROW AGREEMENT

THIS AGREEMENT is made on the 16th day of August, 2007, by and between Fortress Group USA, LLC, a corporation organized and existing under the laws of the State of Michigan (hereinafter "Fortress") and National City Bank (hereafter "Escrow Agent").

## PRELIMINARY STATEMENT

A.    Fortress and Chau Papatheodorou (hereinafter the "Client") have executed a Participation Agreement (hereinafter the "Contract")(see Exhibit "A") dated August 16, 2007, so that the Client may participate in an investment transaction pursuant to which the Client has agreed to deposit the amount of One Million One Thousand Five Hundred United States Dollars (US$1,001,500.00) with the Escrow Agent to be held in accordance with the terms of the Contract and this Agreement.

B.    Fortress desires to have National City Bank act as Escrow Agent and National City Bank consents to so act.

NOW, THEREFORE, in consideration of mutual promises contained herein, and other good and valuable consideration the receipt and sufficiency of which is acknowledged, the parties agree as follow:

1.    <u>Incorporation of Preliminary Statement and Exhibits</u>. The Preliminary Statement set out above and any exhibits identified in and attached hereto are incorporated in this Agreement in their entirety as if fully set out in this Agreement.

2.    <u>Escrow Fund</u>.  On the date of this Agreement Fortress shall cause a deposit to be made with Escrow Agent by the Client, cash in the amount of One Million United States Dollars (US$1,000,000.00) (hereinafter "Escrow Fund") plus One Thousand Five Hundred (US$1,500.00) for the escrow fee.  Escrow Agent acknowledges receipt of the Escrow Fund. The Escrow Agent accepts the deposit by wire transfer in US Dollars and agrees to hold the Escrow Fund on the terms and subject to the conditions of this Agreement.  The Escrow Fund from the Client shall be deposited in an account and duly recorded as a deposit for Fortress #202 Participation.

3.    <u>Investment of Fund</u>.  Fortress hereby directs the Escrow Agent to invest the Escrow Fund in the Allegiant Treasury Money Market Fund, which the Escrow Agent or an Affiliate serves as investment advisor and receives a fee.  During the life of this Agreement, Fortress shall be deemed owner of any income earned thereon for tax reporting purposes.

4.    <u>Release of Escrow Fund</u>.  The Escrow Agent shall release the Escrow Fund only:

a.    Upon written instructions of Fortress (see Exhibit "B") provided to the Escrow Agent directing the release of the Escrow Fund and any specified amount of

income earned thereon less any additional costs (if applicable - for international wire transmissions) in the manner prescribed in such written instructions.

b.    The final, nonappealable order of a court having jurisdiction in this matter under the terms and provisions of the Contract and this Agreement.

5.    <u>Compensation</u>.  The Escrow Agent shall be entitled to reasonable compensation for its services under this Agreement in the amount of One Thousand Five Hundred Dollars ($1,500.00) based on a per year and per Investment Participation Agreement. Further, Fortress agrees to pay this service fee from and immediately upon receipt by the Escrow Agent of the Escrow Fund as reimbursement of the Escrow Agents legal and administrative costs.

6.    <u>Resignation of Escrow Agent</u>.  The Escrow Agent may resign and be discharged from its duties hereunder at any time by giving ten (10) days prior written notice of such resignation to Fortress specifying a date when such resignation shall take effect. Upon such notice, a successor escrow agent shall be appointed by Fortress and such successor escrow agent shall become Escrow Agent under this Agreement upon the resignation date specified in such notice. If Fortress is unable to assign a successor escrow agent within ten (10) days after such notice, Escrow Agent shall be entitled to appoint the successor.  Escrow Agent may at its sole discretion deliver to a court of competent jurisdiction the Escrow Fund, income earned thereon and any related documents if a successor escrow agent has not been appointed within thirty (30) days of the effective date of such resignation. Fortress may substitute a successor escrow agent by giving ten (10) days prior written notice to Escrow Agent.

7.    <u>Liability of Escrow Agent</u>.

a.    Escrow Agent shall have no liability for any action that is taken or omitted by it in good faith. Escrow Agent shall be entitled to rely upon advice of counsel in acting under this Agreement.

b.    Fortress agrees to defend, indemnify and hold harmless Escrow Agent from, against and in respect to; i) any and all liabilities, losses, damages, deficiencies or expenses resulting from any action taken in good faith by Escrow Agent and; ii) any and all actions, suits, proceedings, claims, demands, assessments, judgements, costs and expenses (including the reasonable fees and expenses of legal counsel) related to any of the foregoing, except to the extent that any of the foregoing are incurred by Escrow Agent as a result of its own willful misconduct or gross negligence.

8.    <u>Notices</u>.  Any notice, request or other document to be given to any of the parties by any other party shall be in writing and shall be personally delivered or sent; i) by same day, overnight courier or certified mail, return receipt requested, postage pre-paid; ii) facsimile transmission; or iii) electronic mail transmission, addressed to the party at the addresses identified below or addressed to such other address as may be given in writing by any party to the other.

If to Fortress, at:      Mr. Roger Clark
                         Fortress Group USA, LLC
                         1428 44th St. SW, Suite E
                         Grand Rapids, MI 49509
                         616-530-9864, fax 616-530-9870
                         roger@crm-investors.com

If to Escrow Agent:      National City Bank
                         c/o Allegiant Institutional Services
                         Dawn DeWerth
                         200 Public Square 5th Floor
                         Cleveland, OH 44114
                         (216) 222-9225, fax (216) 222-7044
                         Dawn.Dewerth@allegiantgroup.com

9.    Binding Effect. All of the terms, covenants and conditions of this Agreement shall
      be binding upon and inure to the benefit of, and be enforceable by the parties to this
      Agreement and their respective successors, heirs, beneficiaries, personal
      representatives, trustees, executors, administrators and permitted assigns.

10.   Governing Law. This Agreement shall be construed, interpreted and governed in
      all respects by the laws of the State of Ohio.

11.   Entire Agreement. This Agreement contains the entire agreement and supersedes
      all prior agreements and undertakings, both written and oral, among the parties with
      respect to the Escrow Fund and earnings thereon.

12.   Jurisdiction. The parties agree that any suit, action or proceeding with respect to
      this Agreement shall be brought within Cuyahoga County, Ohio and do waive any
      question of personal jurisdiction or venue for the purpose of carrying out this
      provision.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as
of the date first above written.

"Fortress"
Fortress Group USA, LLC


By: _____
     Roger L. Clark, Managing Member

"Escrow Agent"
National City Bank


By: _____
     Dawn DeWerth, Assistant Vice President

3

## EXHIBIT "A"

## Participation Agreement
## (United States Treasury Bill Program)

This PARTICIPATION AGREEMENT (the "Participation Agreement") referred hereinafter as Exhibit "A", shall be effective from the date hereof and is entered into this 16th day of August, 2007, by and between:

FORTRESS GROUP USA, LLC, (hereinafter "Fortress"), 1428 44th St. SW, Suite E, Grand Rapids, MI 49509, 616-530-9864, fax 616-530-9870, duly represented by Mr. Roger L. Clark, and Chau Papatheodorou (hereinafter "Client"), 2317 St. Francis Drive, Palo Alto, CA 94303, (650) 804-1222, fax (650) 494-1438.

1.    Client wishes to acquire participation in a Private Placement Transaction (the "Transaction") in the amount of One Million United States Dollars (US$1,000,000.00)("Transaction Amount") hereinafter referred to as the ("Fortress #202 Participation"), and Fortress agrees to arrange for the establishment of the Transaction.

2.    Client has further advised Fortress that Client has a complete understanding of the matter pertaining to the above Private Placement Transaction and has relied solely upon his/her/its own legal, business, investment and financial advisors with respect to same.

3.    Client agrees to wire transfer funds in the amount of One Million United States Dollars (US$1,000,000.00) plus One Thousand Five Hundred United States Dollars (US$1,500.00), to pay the escrow fee, to National City Bank (the "Escrow Agent") under certain terms of the Escrow Agreement dated August 16, 2007, ABA # 041000124, Account # 2171150005490 with further credit to Escrow Account # 01000103251. These funds less the Escrow Fee ("Escrow Fund") shall be held by the Escrow Agent for the sole benefit of Client, until the Trade Entity shall deliver United States Government Treasury Bills ("T-Bills") into the Escrow Account equal in market value to a minimum of One Hundred percent (100%) of the Escrow Fund held in the Escrow Account. These T-Bills shall remain in the Escrow Account for a term of Fifteen (15) months. At thirty (30) days intervals after delivery of the T-Bill into the Client Escrow Account, a minimum profit of Thirty Percent (30%) shall be deposited to the Client Escrow Account and disbursed by the Escrow Agent per the disbursement schedule contained in the Escrow Release Instructions, Exhibit "B" herein and shall form an integral part of the Agreement. At the end of the term of Fifteen (15) months, the T-Bills will be redeemed by the Trade Entity with cash equal to the original amount of the Escrow Fund and immediately returned to the Client.

4.    Client guarantees that there will not be any liability incurred from any brokerage, finders, investors, consultants or similar fees in connection with the Fortress #202 Participation.

Fortress Initials _____        Client Initials _____

1

5.  Fortress agrees that, if the T-Bills and the first profits of Thirty Percent (30%) are not delivered into the Client Escrow Account within Thirty (30) international banking days after escrow funds are received, the escrow fund will be immediately returned to Client by wire transfer without protest, offset or deduction whatsoever except for normal wire fee.

6.  Client has made full and complete disclosure to third parties, if any, who have or may have supplied funds which have been or will be deposited into escrow, that said funds are intended to be employed for a certain Private Placement Transaction. Client has received from his/her/its own advisors and fully disclosed to all third parties the risks involved in this Participation Agreement and with respect to the Fortress #202 Participation. In the event of any litigation relating to this Participation Agreement, the losing party or parties agree to pay all of the costs and expenses and reasonable attorney's fees incurred both at trial and on appeal of the prevailing party or parties. Client hereby agrees to indemnify and defend Fortress, the Escrow Agent and Fidelity Investments under any and all circumstances from any and all claims arising as a result of any brokerage, finder or consultant fees with respect to this Participation Agreement or any and all claims arising as a result of any agreements between Fortress and Client and/or Fidelity Investments.

7.  This Participation Agreement may be amended or revised only in writing and signed by both parties hereto. The State of Michigan shall be the legal venue with respect to this Participation Agreement and any action in relation thereto. Electronically transmitted signatures shall have the same standing as an original. Each party hereto warrants that they have full and complete authority to enter into this Agreement and bind their respective person or company. This Participation Agreement may be simultaneously executed in two (2) counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, provided that all such counterparts, in the aggregate, shall contain the legal signatures of all parties to this Participation Agreement. Each of the terms and provisions of this Participation Agreement is to be deemed serviceable in whole or in part and, if any term or provision or the application thereof in any circumstance should be invalid, illegal or unenforceable, the remaining terms and provisions or the application thereof to circumstances other than those as to which it is held invalid, illegal or unenforceable shall not be affected thereby and shall remain in full force and effect.

8.  This Participation Agreement represents the full and complete agreement of the parties with respect to the subject matter of this Participation Agreement and supersedes and replaces any prior understanding and agreement.

THIS SPACE INTENTIONALLY LEFT BLANK

Fortress Initials _____          Client Initials ___CP._____

2

IN WITNESS AND FULL AGREEMENT WHEREOF, this document has been executed as of the date first written above, and shall be effective from the date hereof. Each party, by entering their signature below hereby attest fully and without reservation that they have had adequate time to consult with legal, financial, investment and business counsel, have received full and adequate risk disclosure, and agree fully to the terms and conditions of this disclosure and agree fully to the terms and conditions of this Participation Agreement.

Client

By: _____
Chau Papatheodorou

FORTRESS GROUP USA, LLC

By: _____
Roger L. Clark, Managing Member

3

**EXHIBIT "B"**

**IRREVOCABLE INSTRUCTIONS TO RELEASE ESCROW FUND**

These irrevocable instructions to the Escrow Agent are made effective on August 16, 2007 by Fortress Group USA, LLC (hereinafter "Fortress").

The following instructions are to the Escrow Agent, National City Bank, covering the release of the Escrow Fund and profit distribution deposited with them in accordance with the Escrow Agreement dated August 16, 2007 and known as Fortress #202 Participation. In accordance with the terms and conditions of the Escrow Agreement, the Escrow Fund and profits shall be released per the following schedules.

Schedule A

$       1,500   to the Escrow Agent upon receipt of the Escrow Funds
$ 1,000,000   (the Escrow Fund) to the Trade Entity upon receipt of at least One Hundred Percent (100%) of the Escrow Fund in United States Treasury Bills ("T-Bills") at market value

Schedule B

The above T-Bills shall be held in the Client's Escrow Account as the guarantee of the Escrow Fund until the term of the Fortress #202 Participation shall expire and the Trade Entity shall deposit into the Escrow Account cash in the amount of One Hundred Percent (100%) of the Escrow Fund. In exchange, the Escrow Agent shall release the T-Bills back to Trade Entity and distribute the cash funds to the Client of Fortress, namely Chau Papatheodorou per her provided banking coordinates.

Schedule C

Upon receipt of the profits, Thirty Percent (30%), each month as cash funds, the Escrow Agent shall make the following distribution for the Fortress #202 Participation per there provided banking coordinates:

$180,000    to Chau Papatheodorou per her banking coordinates (60.00%)
$100,000    to Fortress Group USA, LLC Trust Account (33.33%)
$  20,000    to Vernon L. Maes per his banking coordinates (6.67%)

If Schedule A above and receipt of the first profits cannot be completed within thirty (30) international banking days from receipt of the Escrow Fund, the Escrow Agent shall return the Escrow Fund to the client of Fortress that provided it without protest, offset or deduction whatsoever except normal wire fee, and the Escrow will close.

This is the entire and full instructions to the Escrow Agent in respect to the release of the Escrow Fund and supersedes all prior instructions both written and oral.

IN WITNESS WHEREOF, the parties hereto have executed these instructions to the Escrow Agent as of the date first written above.

Fortress Group USA, LLC

By: _____

    Roger L. Clark, Managing Member

**Chau Papatheodorou**
2317 Saint Francis Drive
Palo Alto, CA: 94303
Ph9one: (650) 494-7725
Email:

January 18, 2008

To:    Mr. Roger Clark
       Fortress Group USA, LLC
       1428 44th St. SW, Suite E
       Grand Rapids, MI 49509
       Phone: (616) 530 - 9864
       Fax:    (616) 530 – 9870
       Email:  roger@crm-investeors.com

cc.    Ms. Dawn DeWerth
       National City Bank
       c/o Allegiant Instructional Services
       200 Public Square 5th Floor
       Cleveland OH: 44114
       Phone: (216) 222 - 9225
       FAX:    (216) 222 – 7044
       Email:  Dawn.Dewerth@allegiantgroup.com



Reference: Fortress #202 Participation under account # 2171150005490 with further
           credit to Escrow Account number: 01000103251.

Subject:    Liquidation of Treasury Bills/Bonds

Dear Mr. Clark,

I hereby instruct you to take whatever action may be required to Liquidate the Treasury
Bills/Bonds equal to a net amount of $1,000,000.00 (One Million United States Dollars)
for Cash Funds in the Escrow Account # 202.

Immediately after the fund is liquidated please wire the total fund (of $1,000,000.00
(One Million United States Dollars) to the following banking coordinate:

| | |
|---|---|
| **Bank Name:** | **Washington Mutual Bank: Palo Alto-Midtown Financial Center** |
| **Bank Address:** | **2846 Middlefield Road, Palo Alto, CA:  94306** |
| | |
| **Account Name:** | **Chau Papatheodorou** |
| Bank Routing Number ABA | 322271827 |
| account number | |
| | |
| Bank contact: | Sammi Ho |
| | (650) 853 - 2631 (Phone) (650) 321- 2752  (Fax) |
| | Sammiho@wamu.net (EMAIL) |

You are also instructed to dissolve my participation in the program known as ("Fortress #202 Participation") by reason of "Non-Performance".

I greatly appreciate if you and your Escrow Agent, Dawn Dewerth, would notify me in writing (by email: "Chaupapa@comcast.net") immediately upon the completion of this transaction.

Sincerely Yours,

**Chau Papatheodorou**
2317 Saint Francis Drive
Palo Alto, CA: 94303
Phone: (650) 494-7725
Email: Chaupapa@comcast.net

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
CHAU PAPATHEODOROU, an individual

## DEFENDANTS
ROGER CLARK, an individual; CRM INVESTORS CORPORATION, a Michigan corporation; FORTRESS GROUP USA, LLC, a Michigan limited liability company; NATIONAL CITY BANK, an Ohio corporation, and DOES 1 through 50, inclusive

*ADR*

**(b)** County of Residence of First Listed Plaintiff    SANTA CLARA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
OF LAND INVOLVED

*E-FILING*

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
SEE ATTACHMENT

C08    01905    RS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §§ 1331, 1332

Brief description of cause: Breach of contract, breach of fiduciary ducy, conversion.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 600,000    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE April 9, 2008    SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

NDC-JS44

ATTACHMENT I.(c)

FRANK R. UBHAUS, CA STATE BAR NO. 46085
KARA L. ERDODI, CA STATE BAR NO. 221093
BERLINER COHEN
TEN ALMADEN BOULEVARD
ELEVENTH FLOOR
SAN JOSE, CALIFORNIA 95113-2233
TELEPHONE: (408) 286-5800